May it please the Court, I am Attorney Robert Barnes. I represent Ralph Nader and Donald Dana. We bring two separate claims. The first claim is a political speech claim. Arizona prohibits all non-residents from circulating petitions for anybody, any cause, or any candidate, including Presidency of the United States, in the state of Arizona. This includes Ralph Nader himself to circulate any petition on behalf of any cause or any candidate, including his own, for the most important office in the country. Mr. Dana is prohibited from his right of expressive association with Mr. Nader, and that Mr. Nader is not able to circulate those petitions. I want to ask you a question, and neither side addressed this, but I do have a question on, my understanding is when there was a challenge initially to Mr. Nader, he removed his, he withdrew, and he removed his name from the ballot. Does he have Article 3 standing? Yes, Your Honor. The, under the Williams-Schomburg decision and other related decisions from both the Supreme Court and the Ninth Circuit, an individual, even if they themselves, because of an election dispute, he has standing to bring the petition circulator claim under any instance. But he voluntarily removed himself. I'm sorry? He voluntarily removed him. That would only impact the ballot access issue, not the right to circulate petition issue. The right to circulate petitions is independent of his ballot access claim. That issue is that he himself is not allowed to circulate petitions, period, on behalf of any cause or any candidate in the state of Arizona, including, but not limited to, his own. Okay, what about the ballot access claim? Is that, is that still with us? Yes, Your Honor, I believe it is. The district court dealt with this precise issue and held that Mr. Nader did, in fact, have standing. The state of Arizona, on appeal to my, decided not to raise that claim because the legal issues from the Supreme Court and the Ninth Circuit, which is very broad in the First Amendment context, permits standing under these circumstances to help resolve these issues without undue or unnecessary litigation in the middle of an election. In the ballot access issue, the issue is whether or not the, the aggregate ballot access restrictions, in particular, one of the earliest petition deadlines in the country for an independent candidate, meet the standards under the First Amendment, both for right, voting rights concerns and the Fourteenth Amendment, and for free speech concerns, and for expressive association concerns. The principal case in that regard is the Anderson case the Supreme Court decided in 1981. The district court concluded, and the state argues on appeal, that Anderson is no longer really good law under one factual assumption, that clearly we will never have a primary which will be undecided after March. But here we are. In fact, this primary on the Democratic side clearly won't be decided until at least June, and most likely not until August. So that factual assumption about the limitations on the Anderson decision is clearly invalid. This deadline is one of the earliest deadlines in the country. It's one of the most restrictive. No independent candidate for the presidency has ever made the Arizona ballot, and Arizona only cites five or six candidates for lesser state offices who have ever made the ballot during the 15 years that this election law schema has been put in place. One of the significant issues in this case is the standard of review and the standard that should be applied to these laws. The state of Arizona consistently confuses these two different claims. As this court made clear in Caruso v. Yamhill County, which is cited at 422 F. 3rd 848 at page 856, this court noted there are two different kinds of First Amendment claims in an election context. One is a political speech claim. The other is a political process claim. The political speech claim here, the political speech, if there is an actual prohibition on political speech itself, that is always subject to strict scrutiny. If on the other hand, it is simply a political process limitation, such as a ballot access restriction, then the question is whether or not it is a severe restraint or whether or not it is a selective or discriminatory restraint as to whether or not strict scrutiny applies. Well, let me say, let's say if I agree with you that the strict scrutiny standard should be applied to a challenge to Arizona's residency requirement statute for circulators because it places a severe burden on political speech. It seems like the district court kind of did that anyway, but didn't say it specifically. But let's say I buy that argument. Does it have to go back to the district court? No, Your Honor. Because it's a pure question of law, this court can deal with the issue directly. The district court did appear to apply strict scrutiny. The only grounds that were articulated were the, that the State has almost exclusively relied upon after more of a kitchen sink approach from the district court below, is that the requirement of subpoena process. The problem here is, as the Krisloff Court noted in the Seventh Circuit, as the Frommie Court from the Western District of Wisconsin noted, as the City of Colorado v. Arvada in the Tenth Circuit noted, there's an easier and far less restrictive method of ensuring that circulators will be present at a petition challenge proceeding. Well, I do have a question about that. I think that you did raise, you raised several things down below, and the district court narrowed its function and didn't address certain things. And on the point about where there seems to be some case law to indicate that if people would agree to being subpoenaed, the district court didn't address that part of it. Does that have to go back for that? No, Your Honor. This court can deal with that issue directly. Well, is the record really developed on that? It is. It's that the issue is whether or not, as a legal matter, as a facial constitutional challenge, does the law, could they, Arizona, have provided a less restrictive means of ensuring a circulator's presence at a proceeding, assuming these privatized petition proceedings and circulator's testimonies are necessary, neither of which Arizona showed below. The easier way is? The easier way, Your Honor, is they simply require a circulator to agree, as a condition of circulating petitions, that they be available for service or process. And, in fact, what happens in Arizona right now is if the — when they challenge Mr. Nader's petitions — Wherever they are. Precisely. In fact, the — they already have the constitutional power to do so because they already engage in a — It could get a little expensive. I'm sorry, Your Honor? Tracking somebody down in Manhattan could get a little expensive. Well, the easy way to do so is, in fact, this already happens in Arizona's proceedings. If you — your circulator doesn't appear, the evidentiary inference by the court can be against that circulator. So it's on the burden of the circulator has an incentive and the candidate or cause has an incentive for that circulator. I think that's an important issue, but I'm just not sure it's completely developed. The court could clearly remand for more factual development, but the Seventh Circuit of the Western District of Wisconsin both found that the ability of the State to require them to subpoena circulators or to condition the circulating of petitions upon their willingness to do service of process was sufficient and a far less restrictive means than banning all nonresidents from engaging in core political speech in a presidential campaign. Did the District of Wisconsin, Judge Crabb, did — was that a factual determination on her part, or was she following the Seventh Circuit decision? She was following the Seventh Circuit, which noted in the footnote that this was a far easier remedy to resolve the problem. Right. But that's not a factual determination. That was a footnote. It was, you know, an observation. We don't have to follow that. No, this circuit does not have to follow that. However, if the court were to affirm the district court, it would clearly create a split between the circuit and the Seventh Circuit, which found that — That wouldn't be the first one. No, I'm sure that is correct. But this is one case where the circuit should agree with the Seventh Circuit. There are some circumstances where that may not be correct. As to the ballot access restriction, the — or as to the subpoena of the service process, there's also other ways in which most States don't even limit circulating petitions at all. They don't put any ban on circulating petitions. Many States have all kinds of alternatives for getting on the ballot. For example, let's consider Arizona. To get on the presidential primary ballot in February doesn't require any petitions, doesn't require any filing fee, and they've had no voter confusion, no chaos at the ballot, or anything else. So there are far easier ways to ensure that voters have maximum choice with minimal confusion on the ballot without such a severe restriction on the free speech of 95 percent of America. As to the ballot access restrictions, there are individual restrictions and aggregate restrictions. The principal restriction currently is the ballot access deadline, which is one of the earliest in the country. In fact, the State of Arizona just moved it up one week in advance. So it is, as such, an early deadline, which has been struck down by other States. What is it for this year? June 2nd, I believe, Your Honor. So the ballot access deadline will be before the Democratic Party has resolved who its nominee for president even is. Least of all, its vice president will have no intervention position on our platform. The issue here is not only that restriction, but the district court, in a separate case in Arizona, had recommended looking at the laws holistically. The restrictions here have one of the highest signature requirements, one of the earliest deadlines. It criminalizes a person signing more than one. Let's say you want two independent choices on the ballot because you're not sure which one you're going to vote for. You can't do so. It's a crime in Arizona to do so. So you have more and more restrictions on who — But that's not before us, is it? It was one of the issues raised in the district court below, Your Honor. Because of these — Is it in the complaint? I'm sorry, Your Honor? Is it in the complaint? No. The complaint is based on the early deadline. However, district court of Arizona has previously said the court has to assess that in the context of all the other restrictions and restraints. So in assessing the severity of the deadline burden, all of these other burdens are important and significant in assessing whether it is a severe burden or not and whether it meets strict scrutiny. Clearly, it can't, assuming the burden is a severe burden or it's a selective burden, which it is both here, because partisan candidates do not have any of these burdens for presidential primary nomination process in Arizona. Separately, it cannot meet the strict scrutiny standard. For example, Arizona's standard always used to be 40 days before the election. It had no problems during 100 years of a law that only required 40 days prior to the election for submission of petitions or submission of one's candidacy. Not only that, right now in Arizona, for the presidential primary process, you only have to submit your petitions or submit your nomination 40 days before the presidential primary. They've had no problems with ballot chaos or confusion in any of those presidential primaries. In addition, for all of the other primary candidates, which is the independent candidate deadline for the general election ballot, is tied to the primary election candidate for the primary election ballot, which is more than two months prior. They have petitions and constitutional amendments and other issues that involve far more signatures, far more confusion, far more capability of fraud, and yet the 90-day period for that primary candidacy is easily met and they've had no problems administering the ballot or enforcing the ballot in that context. Consequently, this standard cannot meet strict scrutiny. Clearly, 90 days is more than sufficient for the State of Arizona to meet its obligations or standards under all of the civil rights laws and other laws, just as they already do for the primary process. As the Supreme Court has said, 90 days should be more than sufficient. Under those two circumstances, the ballot access restriction is a severe one, it is a selective one, and it does not meet strict scrutiny, and that as well should be invalidated. Because it is a pure question of law, I don't believe it requires a remand either. As to the issues of the circulator petitions and alternative methods of procuring their to determine whether or not a voter's signature is valid, which is the whole point and purpose of these petitions. The petition is, did the voter sign it? There's all kinds of ways to do so. In fact, every city, county, municipality, and state in the country, daily or weekly or monthly, does precisely this. They take the petitions, they do a random sampling of the signatures on the petitions, match them up against the confidential, unknown voter signatures, unknown to the public, only known to the election official, trained and tutored to manage this process, and match it up to make sure it is accurate. If in their random sample they reach a higher rate of error than is permissible for the number of signatures to be valid, then they do a broader random sample, and if that broader random sample produces the same problem, they invalidate the petitions, and it becomes the duty of the candidate or the cause, as it may be, to show that in fact they obtained enough valid signatures. Arizona could clearly do the same without this extensive and expensive private time. Sotomayor, do you think that they have an interest in going after people who are obtaining fraudulent signatures? Well, they absolutely have an incentive. In fact, what they showed in Arizona is they didn't show any connect. Both the Western District of Wisconsin and the Seventh Circuit recognize the appropriate fraud standard as a justification of motivation for a restrictive law on speech or ballot access. It should be that the particular problem is identified and solved by the particular legislative resolution or solution. Here, they have not shown they've had any problem with nonresidents being uniquely fraudulent or nonresidents being uniquely trying to forge signatures or trying to forge circulating petitions or anything of the nature. Well, there are limited situations in which nonresidents are going to be out there circulating petitions. Probably a presidential primary would be the perhaps the only one, but I don't think that's the case. So there has been fraud in the past, and it has been recognized that preventing fraud is a compelling interest, isn't it? And the criminal laws already work for that. The nonresidency ban doesn't – has not been shown to have helped them at all in enforcing against fraud. It's the laws already on the books against fraud. As the Supreme Court noted in the village of Schomburg, the fraud excuse is a very easy excuse for the States to utilize. So they said the ballot stage and the petition stage is not at the election stage, and given that distance, the State must meet a higher burden to show the fraud. They've shown no correlation that nonresidents are going to be uniquely able and capable of committing forgery or fraud. Instead, what they've shown is their criminal laws on the books have already been very effective at nailing, investigating, and prosecuting residents who commit such forgery or commit such fraud. That is completely sufficient, and they don't need to ban everybody's speech to do so. The – as to the ballot access issues, the State of Arizona suggests that some of the issues weren't raised below. The issues were – and we cited to the record, and I won't repeat what we did in our reply brief – that many of these issues were specifically raised below. There was all kinds of litigation involving interveners and lots of other people. There was a stay proceeding before the Ninth Circuit. So these issues had been briefed repeatedly and substantively. As to the earliness of the – Are you suggesting – I'm just trying to understand where we go with this. Sure. How you write opinion here. Are you suggesting that they can't enact any kind of – that the State has to wait until their existing – until some minimal requirement for circulators fails to enable the State to go after fraud in order to – in order to pass – enact a different one? Not at all, Your Honor. Our contention is simply that the nonresidency ban is not the means or method by which to capture forgery or fraud. There are other substitutes that they can put in place that will more adequately – Well, the Supreme Court has thrown out a registration – actual registration requirement. Yes, Your Honor. Saying that eligibility to vote is far more inclusive. And so, therefore, the registration is not narrowly tailored and that has to go. Now, we get the – what the Supreme Court was comparing that to in this case. And we say, well, there's still something lower. We keep going lower and lower and lower. Is that it? We just keep throwing – we just peel back the onion and throw out everything? We keep making speech broader and we make their laws more specific. Namely, that they want people to be available for service of process. They require them to be available for service of process or the inferences against their circulating activities for the cause or candidate they represented. That is more specific and more helpful for detecting forgery and fraud in the current law. For example, let's say someone circulates petitions in Arizona who at that time is a legal resident but then leaves the State of Arizona at the time of a petition challenge. They would – that this law currently doesn't cover that individual. We make the State's laws relate to fraud and forgery, not be substitutes, not have broad scale wholesale prohibitions on speech as a substitute for restricting forgery and fraud when it's too broad. And the scope should be specific in particular to the fraud and forgery they seek to prevent and preclude. The reality is a lot of these laws and the backdrop for these laws is ones on believing there should be grassroots participation. That's what the Supreme Court rejected and the State legislatures have only somewhat accommodated that Supreme Court decision. So the clear direction that this Court can provide is that State legislatures should focus on what is precisely the problem, forgery or fraud, and a specific law tailored to resolve that problem, not rely on wholesale prohibitions on core political speech for 95 percent of America. How do you reconcile that with our decision on banning paying electoral petition signatures? I'm sorry, Your Honor? We're bound by our own circuit decisions. I thought we had a decision that it's okay for the State to ban paying circulators. That is the Preet decision, Your Honor. Yes. The Court went out of its way at Preet to note, I believe, at page 963, which it said this case does not involve here. In fact, to quote the Court, here anyone can circulate a petition regardless of residency or registration. They also noted in footnote 5, the panel noted that the issue of fictional constitutionality was not before the Court and there was no factual evidence that anybody had been prohibited or precluded from circulating any petition in the State of, I believe, Oregon. So that's the factual distinction between that case and this case. Here 95 percent of America is prohibited from circulating a petition in the State of Arizona in a national presidential election. So here there's an actual direct prohibition on core political speech. There's no question that the number of petition circulators is limited in the amount of the audience. There's no question that people wouldn't come in from out of the – a lot of people wouldn't come in if they couldn't get paid. No, actually, there's a good number of people who will be – Sure there are, but there are a lot of people who won't. Oh, but it's also – So that a ban on – so that a ban on paying people is going to prevent a lot of people from coming in to circulate petitions. Well, I think I would limit – both the Meyer decision and the ACLF decision made clear that a ban on paying them would also be unconstitutional. What this Court said is the particular limited method that the State imposed in Preet, which said you can pay them in all these other ways. You just can't pay them on a per-signature basis. And given the very limited evidentiary development in that particular case, no evidence that any circulator was prohibited from circulating petitions, those two things distinguish that case from this case. I will reserve the last 30 seconds for rebuttal. Okay. I'll give you a minute. I think you can get more words in a minute than anyone I've ever seen. In my 11 years of being an appellate judge. Good morning. May it please the Court, my name is Barbara Bailey. I'm with the Arizona Attorney General's Office, appearing on behalf of Arizona Secretary of State Janice Brewer. The Court should uphold the two restrictions at issue in this appeal because they're reasonable, they do not impose a severe burden on candidates, they serve to further important and compelling State interests in conducting the elections in Arizona. If the Court looks at Arizona's overall election scheme, it should hold that the restrictions at issue here are indeed constitutional. Are you still advocating that it should be less than strict scrutiny review? Yes, Your Honor. I think I have a problem with that. But if, and assuming I do, are you still okay on this record? Yes, Your Honor. And I was just going to add that Judge Martone in the district court, he looked at the burden with regard to each of the two restrictions and found that it was not a severe burden. But he went on and after that found that it still was narrowly tailored and that there were compelling State interests that were served by these restrictions. So I would answer your question in the affirmative that these restrictions should be upheld, regardless of the level of scrutiny that the Court applies. Is there any jurisdiction issue here? Your Honor, as the. . . In standing? Yes. It was challenged below by the State, and Judge, the district court found that this was an issue that was capable of repetition, given that it was in the election context and chose to determine that there was standing. And as Your Honor is aware, the Secretary of State did not challenge standing on appeal. I didn't come to address the standing, but if you have specific questions that I might answer, I'd be happy to try. Well, you know, I do have questions about the tailoring issue in that it doesn't appear that the district court addressed a number of arguments that appellants made on how Arizona's circulator restrictions could be more narrowly tailored, including the requirements of circulators making themselves subject to the service of process and the voter's signature cards are better evidence of validity of signatures than circulator testimony. And if you look at the Seventh Circuit in Kresloff and the Tenth Circuit in Chandler, they suggest that the imposition of a requirement that circulators make themselves subject to service of process is more narrowly tailored. You know, what, you know, if the court not having addressed that, does it need to go back for the court to address that argument? It seems that that's not really a throwaway argument. Your Honor, I think it may be something that could, it may be an issue that could benefit from further factual development. But I would point out to the court, to address the concern that you have raised, that although a couple of other courts have suggested that this would be a less restrictive means of accomplishing the compelling interest of reducing fraud in the petition process, those courts were not, of course, addressing Arizona's election scheme. And it is easy to come into the court and say, well, Arizona could easily do this, without explaining how that necessarily fits into the overall concept. Well, that's what I'm asking. If I had that lingering concern, let's, I mean, let's just assume, and I'm saying assuming for the fact that I said, okay, the state does have a compelling state interest in preventing voter fraud, and that the time limits are okay. But my question is, could it, you know, could it be more narrowly tailored? And the court didn't address some of those issues on that. Is the record, the appellant's counsel seems clear that he feels that the record is adequately developed. I don't know what all the problems would be. Is the record adequately developed? I mean, could it be different in different states on that issue? I think it could be different in different states, Your Honor. As part of the record before the district court, we had included, we had submitted affidavits of the state election director and the election director of Maricopa County, which is Arizona's most populous county, Karen Osborne, who explained to the court and set out in detail Arizona's process. We, the state of Arizona, gives the benefit of the doubt to candidates with regard to their petition signatures. What has not been mentioned this morning in the appellant's argument is that the candidates come in and they submit their petitions, their nominating petitions to the filing officer, in this case it would be the Secretary of State, and they are presumed valid. The candidates get the benefit there, and only if a qualified elector comes in and challenges those signatures is there then a process by which that challenge can be adjudicated in the courts. And this is all a very ñ I've got to say, I have a little trouble accepting a premise, you know, we lean over backwards to get them the benefit of the doubt when, in fact, no presidential candidate has made it to the ballot since these regulations were adopted and implemented. It doesn't sound like the candidates view the state of Arizona as doing them any favors. Your Honor, it is true that the record shows that no independent candidates for president have made it to the ballot. Since these laws, these restrictions have been in place. However, the record also shows that some 11 candidates, independent candidates, for other offices in the state have indeed made the ballot as independent candidates. Are they required to gather 14,000 signatures? They are each required, depending upon the office sought, to gather percentages. It does vary with the different offices. And if the court is ñ But the point of it, I mean, it may be a percentage, but it's a whole lot easier to gather a certain percentage in a town, I don't know, township, whatever geographical divisions or political divisions Arizona has than it is for a statewide office. Even for a statewide office, is an independent candidate for governor required to obtain the same 14,000-whatever-signatures? I think, and I don't have each of the requirements for each office committed to memory, but I think the point is well taken, Your Honor, that there probably is a larger number of overall signatures that would be required for independent candidates for president. I would point out, though, as the ñ I would like to point out to this Court a couple of things that the district court found significant. One of those things was that in this case, Mr. Nader's campaign did indeed actually submit over 20,000 signatures by the June deadline, which, incidentally, it is June 4th this year, not June 2nd, but just to correct that. Over 90 percent of those signatures were collected within the last two weeks before the deadline. Now, it is true that we don't know, it was never determined through the challenge process whether those signatures were valid or not. Was anybody ever criminally prosecuted? With regard to Mr. Nader's campaign? Not in Arizona. See, I mean, it's not hard to infer if they submitted 20,000 and they acknowledge they don't have enough, then let's just say for purposes of discussion, there are 10,000 signatures that are phony. The State does nothing to pursue that for criminal prosecution, but comes in and insists, well, we need this protection so that we can enforce our laws against fraud. Something doesn't connect up there. I mean, if the State's really determined to enforce its laws against fraud and are enacting these regulations so that they can be vigorous about it, you would have expected at least one criminal prosecution from 10,000 fraudulent signatures. It doesn't seem to have any. Your Honor, in this case, the challenge was with, I shouldn't say, the campaign. That didn't make the signatures any less fraudulent. Well, I should say that. Do you prosecute frauds only if they're successful? Your Honor, I would point, again, to the record in a. . . In fact, the explanation for why the dates are set or the residency requirement is imposed. Your Honor, I would submit that in the record, again, before the trial court, which I don't believe it's in the excerpts of record, but it is, I believe, docket number 46, where the statement of facts and the supporting affidavits were submitted by the State. And there is numerous public records of convictions and charges that have been brought based on petition circulator fraud. And I do. . . Let's go ahead and focus on those then. I mean, maybe nobody on the Nader petitions were pursued. Other people are. Is there any requirement, these requirements that are offered up which impose limits on ballot access, are they really necessary for criminal prosecution? Is there anything that would prevent the State of Arizona from prosecuting somebody who circulated petitions that turned out to contain lots of fraudulent signatures and seek to extradite that person from another State? Your Honor, I don't believe that's the primary purpose of the requirement, to prosecute. . . So what is the purpose of the requirement? It would be to permit the challenge process, the court proceedings that happen within 10 days after the filing deadline, and then they go up on appeal from there. These are material witnesses. . . So what's wrong with the alternative of having a petition circulator appoint a process or an agent for service of process or agree to appear? Why won't that work? Your Honor, as Judge Schroeder mentioned, I think she alluded to the fact that this could become a cumbersome process. Arizona has . . . If it's cumbersome, that's one thing. But closing the door and bolting it shut isn't a real attractive alternative. I mean, if a strict student applies and you're required to come up with something narrowly tailored, vague references to cumbersome really don't carry the day. What's wrong with the alternative being suggested and pretty specifically put on the table in the context of this case? What's wrong with it? I'm not sure how workable it would be. I will not represent to the Court that it absolutely would not work. So can we conclude that the system used by Arizona is narrowly tailored if the alternative is one to which you have an answer, gee, I'm not sure? Your Honor, maybe I could answer your question coming at it in a slightly different way. As this Court acknowledged, I believe, in the Preet decision, the Court should consider before getting to the level of strict scrutiny what burden has been shown, what showing for the burden has been made. In this case, and it hasn't come up to this point in my argument, but no burden was shown by the penalty. Is there any State in the country for which the statement is true, as you concede it is for Arizona, that since 1992 there have been no independent presidential candidates on the ballot? I don't know, Your Honor. Is the burden — I'm having a little trouble here. Some deference is to be given the legislature in establishing requirements. Is the burden when the State says this is a compelling interest, it's challenged, and the State says we have a compelling interest in whatever, is it the State's burden to come forward with a showing, factual showing, that there is a compelling interest, that a lesser restriction would not achieve the same purpose, or is it the challenger's burden to show that the purpose could be achieved by another, by a lesser burden? And is that a question of law? Can the challenger just say, as a matter of law, this is better? Or how do we deal with this? Yes, Your Honor. You raise a good point. And the cases — I, of course, read many cases dealing with all sorts of elections — election restrictions — don't parse out as finely as one might like that precise issue as to how the burden of proof may shift depending on what showing is made. In a case like this where there are questions about what restrictions might be less restrictive, but yet achieve the same goal or purpose, it may be beneficial to allow some factual showing to be made on that point. In this case, though, I, again, would direct the Court to the Preet decision, the language in Preet, and also the Yeager decision in the Eighth Circuit. I know that, of course, is not binding on this Court, but the Yeager Court addressed really a very near-identical restriction. It was a residency restriction on petition circulators. And in that court, the Court upheld the restriction because they found that the petitioners or the challengers in that case did not make any showing of how it burdened them. And the Court went on to note that there were — you know, anyone in the state who is eligible voting age or eligible to register to vote could, in fact, circulate petitions. And I would like to point out that the Yeager courts issued that decision several years earlier than that. They addressed a registration requirement before Buckley did and actually found that the registration requirement, that was not justifiable, and they struck that down. But then looking at the residency requirement, the Court upheld it because it found that there wasn't a showing of any burden. That's what this Court did in the Preet case. The Court in Preet said that the petitioners or the challengers have to show that there was a burden. There was — we will look at the degree to which the pool of circulators has been decreased. In this case, no such showing was ever made. Ginsburg. They say you've cut everybody else who lives anywhere in the country from coming in to circulate. And they've got at least one person. Well, there is no person before this Court, neither of the plaintiffs in this Court have alleged to. There was at one time, I guess. Yes, that is correct. But early before the summary judgment proceeding, two of the plaintiffs, one of which was alleging that he wanted to come into Arizona and circulate petitions, he was voluntarily dismissed from the case. But to answer your question — Presumably Mr. Nader could circulate his own petitions. I'm sorry? Presumably Mr. Nader would qualify himself. He's a nonresident who could circulate petitions. He would or would not qualify. Is there a reason he wouldn't? Yes. He's a nonresident. He could circulate a petition. Doesn't he have standing to raise that argument? Well, he would. He did not. He's never made any allegation in the complaint or otherwise that he actually wished to do that. But I would like to just point out one other aspect of the Ager decision, which I think is worthy of the Court's consideration, and that is the restriction that is at issue is a restriction on certifying the signatures. It is not a full-blown ban on political speech. Mr. Nader is free to come into the state of Arizona and talk to as many supporters or recruit as many supporters as he would like to train and recruit volunteers to work in his campaign. One of the things that the appellants said to the district court below in their papers was that Mr. Nader actually was a candidate for president in 2000 and garnered 45,000 votes from the voters of Arizona. This is not a stranger to Arizona. This is not someone who has established that either the filing deadline or the residency requirement actually imposed any burden whatsoever in his campaign. But do we adjudicate First Amendment claims based on whether it's Mr. Nader or someone else? Or, you know, it gets kind of dicey when you try to tailor it to Mr. Nader as opposed to it could be anyone. Yes, Your Honor. I think it is the cases are not all that clear on that point. Again, I have looked carefully at what the courts have done, particularly in these kinds of challenges. And going back to kind of the well-established principle of Anderson and Burdick and Timmons, the court first looks at the burden. And this court then said in Preet it makes very clear that there has to be a showing of the burden. And the court required it, went through exhaustively in Preet and explained, you know, there was all this evidence presented in that case, and the court found that it didn't support a finding that this particular restriction unduly burdened the petition circulators and it upheld the restriction. In this case, there was no evidence presented at all. But we can't interpret this statute to say it doesn't burden Mr. Nader, but it would burden someone else. I mean, it can't be, the determination of burden can't be because Mr. Nader is who Mr. Nader is, I don't think. Yes, Your Honor. And, again, I know I'm out of time, but I would point out that other, that the restriction is on certifying the signatures. It is not that Mr. Nader cannot come into Arizona and convey his message to as many people as he would like. Thank you, Your Honor. Let's see how many words you can get in in a minute. Yes, Your Honor. Three points. First, Mr. Nader was the nonresident circulator who did want to circulate petitions in Arizona, and that issue was raised. It was a subject of a colloquy between the judge and the State. Secondly, as to those other out-of-circuit cases involving upholding a residency ban, unlike the Seventh Circuit, which struck it down, they simply assumed that the subpoena requirement was sufficient. They don't do any substantive analysis as to whether the subpoena is at, the requirement to ban all nonresidents is truly narrowly tailored given alternatives. They don't address any of the alternatives in those decisions. Third, the Court is correct that generally deference to the legislature is proper. But as Justice O'Connor has noted and as the Supreme Court noted in Anderson and footnoting U.S. v. Caroline products, the requirement of concern for insular minorities and independents who are not normally represented in the legislative process and who legislators, when regulating their own competition, have an incentive to limit that competition, not expand it, even at the expense of speech, compels a more exacting scrutiny to be performed. Thank you. Thank you, Your Honor. The case just argued is submitted. That concludes the Court's calendar for this morning, and the Court stands adjourned. All rise. The Court for this session stands adjourned.
judges: Schroeder, Clifton, Callahan